UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CONSERVATION LAW FOUNDATION,
INC. et al.,

     Plaintiff,

v.

NATIONAL GRID USA et al.,

     Defendant.

No. 24-cv-12830-GAO

**REPORT AND RECOMMENDATION ON DEFENDANT BOSTON GAS COMPANY'S
MOTION TO DISMISS**

CABELL, U.S.M.J.

## I.    INTRODUCTION

Plaintiffs Conservation Law Foundation, Inc., GreenRoots, Inc., Mothers Out Front, Inc., and fifteen individuals ("Plaintiffs") have brought suit against National Grid USA, Boston Gas Company (Boston Gas), and National Grid USA Service Company, Inc. ("Defendants"), alleging that Defendants are responsible for numerous gas leaks that have significantly harmed the environment. Boston Gas moves to dismiss the operative amended complaint, which asserts several statutory and common law claims.    (D. 20). Defendants National Grid USA and National Grid USA Service Company, Inc. (collectively, "the corporate affiliates"), also join in the

motion.[1]  For the reasons explained below, the court recommends that the motion be granted in part and denied in part.

## II.  <u>RELEVANT FACTS</u>

The complaint's allegations are taken as true for purposes of the motion to dismiss.  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  Defendants "own, operate, and maintain" more than 11,000 miles of underground gas distribution pipelines and more than 770,000 service pipelines in Massachusetts.  Over time, these pipelines are susceptible to corrosion and cracking, which may subsequently lead to gas leaks.  During the first three months of 2025, 7,860 gas leaks were detected in Defendants' service area, and 860 were detected in nine "Affected Neighborhoods" in the cities of Boston and Chelsea, including one leak that is 33 years old.

These gas leaks may have dangerous environmental and health effects.  The methane present within Defendants' pipelines is highly flammable.  When methane concentrations between 5 percent and 15 percent accumulate within an enclosed space, "any ignition source will cause an explosion or fire."  Static electricity, electric sparks, lightning, and open flames, *inter alia*, may ignite methane.  Plaintiffs allege that the buildup of methane may also

---

[1] The corporate affiliates also move separately to dismiss.  (D. 18).  Their motion is addressed under separate cover.

cause manhole covers to explode, potentially injuring individuals and damaging property.

Gas leaks can also damage trees and exacerbate what Plaintiffs refer to as the "heat island effect." According to Plaintiffs, trees reduce surface and air temperatures by providing shade and by using heat from the air to evaporate water. Moreover, trees generally provide environmental, health, social, and economic benefits to their communities. Plaintiffs allege that the methane from Defendants' gas leaks damages and kills trees throughout Boston. The loss of trees increases the heat trapped within urbanized areas.

When gas leaks occur, Defendants generally repair the leak. However, Plaintiffs claim that Defendants have failed to timely and adequately repair the gas leaks on numerous occasions and that newly replaced pipelines have continued to leak. Per Plaintiffs, the leaks result in a repair failure rate of 43 percent, i.e., "leaks that appear at least twice within the same 12 feet." To address the repair failures, the Massachusetts Department of Public Utilities ("DPU") required Defendants to implement a Gas System Enhancement Plan ("GSEP"), that is, a "cost recovery program for gas utilities to address and remediate an aging gas distribution system of leak prone pipes over time."

On August 13, 2024, Plaintiffs notified Defendants of their intent to sue under various federal statutes and supplemented the

3

notice on February 28, 2025, to add additional plaintiffs and violations.[2] Plaintiffs then filed the present operative complaint on May 30, 2025, more than 90 days after the supplemental notice letter.

Plaintiffs allege they were injured by Defendants' actions where they "live, work, and recreate in the Affected Neighborhoods," throughout which there exist gas leaks. Plaintiffs "form special bonds with the trees in their neighborhoods" and "value the trees . . . for the aesthetic, recreational, health, and ecosystem benefits of trees, including mitigation of the heat island effect and protection against extreme heat." Concerns about Defendants' gas leaks have caused Plaintiffs to "reduce or alter their commutes, recreation, and other activities." In addition to the aesthetic and health benefits, Plaintiffs claim to "suffer special injuries from the imminent risk of explosion and fire . . . that are different from those suffered by the rest of the public." Finally, the "gas leaks and nearby damaged trees negatively affect property values in Plaintiffs' neighborhoods."

## III. **THE COMPLAINT**

The complaint asserts 13 claims:

Counts 1-3 allege violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k; Counts 4-8 allege

---

[2] Plaintiffs filed their initial Complaint on November 11, 2024, slightly more than 90 days after the initial notice letter. (D. 1).

violations of the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60101-60143; Count 9 alleges a violation of the Massachusetts Public Shade Tree Law ("PSTL"), M.G.L. c. 87, §§ 1-14; Count 10 asserts a violation of the Massachusetts Environmental Citizen Suit Statute ("ECSS"), M.G.L. c. 214, § 7A; and Counts 11-13 assert common law claims for negligence and nuisance.

In moving to dismiss, Boston Gas argues pursuant to Fed. R. Civ. P. 12(b)(1) that some plaintiffs lack standing to bring suit, butt argues principally under Rule 12(b)(6) that none of the counts asserts a viable claim for relief.

## IV.    LEGAL STANDARD

In opposing a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden to "support allegations of jurisdiction with competent proof." *O'Toole v. Arlington Tr. Co.*, 681 F.2d 94, 98 (1st Cir. 1982). The court may look beyond the pleadings to determine whether it is vested with jurisdiction. *See Rodgers v. Callaway Golf Operations, Inc.*, 796 F. Supp. 2d 232, 237 (D. Mass. 2011); *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002), *as corrected* (May 8, 2002).

As part of this subject matter jurisdiction analysis, courts may consider standing because "standing is a prerequisite to a federal court's subject matter jurisdiction." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 75 (1st Cir. 2012) ("Article III

standing presents a question of justiciability; if it is lacking, a federal court has no subject matter jurisdiction over the claim."). To establish the "irreducible constitutional minimum of standing," plaintiffs must show that they have suffered an "injury in fact," a causal connection between the injury and the defendants' conduct, and that the courts can, through a favorable decision, redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The First Circuit applies "the plausibility standard applicable under Rule 12(b)(6) to standing determinations at the pleading stage." *Hochendoner*, 823 F.3d at 730.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The allegations must have enough "heft" to "raise a right to relief above the speculative level." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (internal citations and quotations omitted). In determining whether a plaintiff has sufficiently alleged a claim, the court "may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken." *Patel v. Wolf*, 427 F. Supp. 3d 161, 164 (D. Mass. 2019).

## V.    DISCUSSION

## A.    Organizational Standing of Mothers Out Front and GreenRoots

The court first addresses Defendants' threshold contention that the court lacks subject matter jurisdiction to hear any claims brought by two organizational plaintiffs, Greenroots, Inc. (Greenroots), and Mothers Out Front, Inc. (Mothers Out Front), because they fail to plead sufficient facts to demonstrate Article III standing.  To have standing to seek relief in federal court, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (internal citation omitted).  "Where, as here, the case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element" of the "irreducible constitutional minimum of standing."  *Id.* (internal quotations and citations omitted).  Defendants contest here whether Greenroots and Mothers Out Front have sufficiently alleged an injury in fact to establish standing.  The court finds that they have.

To begin, when considering whether an organization has standing, "we conduct the same inquiry as in the case of an individual."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).  An organization may sue when it has alleged a

7

"'concrete and demonstrable injury to the organization's activities,' with a 'consequent drain on the organization's resources' that is 'more than simply a setback to the organization's abstract social interests.'" *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 379 (D. Mass. 2025) (quoting *Havens*, 455 U.S. at 379). Establishing organizational standing "is not a demanding standard, since 'only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact.'" *Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F. Supp. 3d 130, 142 (D. Mass. 2021) (citation omitted).

Plaintiff GreenRoots is a "resident-led organization . . . [that] researches and mitigates the effects of extreme heat, plants trees in the City of Chelsea, and plans and implements climate resilience measures." Plaintiff Mothers Out Front is a "member-led climate justice organization . . . [that] testifies in administrative proceedings related to natural gas infrastructure, leads campaigns to spread awareness about the harms of gas leaks, and researches the health effects of natural gas pollution." Plaintiffs argue that "Defendants' conduct impedes the missions and core activities of GreenRoots and Mothers Out Front and diverts resources to address those impediments." Moreover, both organizations claim to have "diverted [] scarce resources . . . to counteract Defendants' noncompliance" with state and federal regulations.

The court does not find Plaintiffs' fund-diversion argument compelling. Spending "considerable resources" to the detriment of other spending priorities does not establish standing. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (internal quotations and citation omitted). "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

On the other hand, though, the court finds that Plaintiffs have pled sufficient facts to show that Defendants' actions have impeded GreenRoots' and Mothers Out Front's missions and activities. *See* D. 16 at ¶ 188. In this regard, the court does not consider any impact on the organizations' advocacy efforts when determining whether an injury in fact exists. *See Uejio*, 521 F. Supp. 3d at 142 ("An organization lacks standing when it asserts no injury other than an injury to its advocacy."). That said, Plaintiffs claim that both organizations, in addition to their advocacy work, operate services that have been "perceptibly impaired" by Defendants' actions. *All. for Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). GreenRoots "undertakes many activities to increase tree canopy coverage . . . and has planted over 2,000 trees in Chelsea." "[G]as leaks kill the trees that [GreenRoots] plant[s] and care[s] for" and

exacerbate the urban heat island effect, which GreenRoots seeks to combat. Mothers Out Front similarly "plant[s] trees and increase[s] canopy coverage in Boston." As Plaintiffs noted at the hearing on Defendants' motion, "Mothers Out Front's mission is . . . among other things, to ensure that all children can live and play and learn in a healthy environment. And to effectuate that, one of the things they do is they plant more trees to increase tree canopy." (D. 38 at 46.) Gas leaks hinder the organization's projects since the leaks "reduce the tree canopy that we work so hard to increase."

GreenRoots and Mothers Out Front have at least plausibly alleged that Defendants' actions have interfered with Plaintiffs' "core business activities." *Id.* at 395. By possibly contributing to the killing or damaging of trees planted by these organizations, Defendants may have perceptibly impaired the organizations' activities, establishing an injury in fact.

The court finds accordingly that the organizational plaintiffs have sufficiently pled an injury in fact and have standing to proceed.

**B.    Counts 1-3 - Violation of the RCRA**

Counts 1-3 allege violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992k. The court agrees with Defendants that these counts should be dismissed.

The RCRA is a "comprehensive environmental statute" that seeks "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)).

The RCRA defines "hazardous waste" as "solid waste" which may cause serious injury or pose a "substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5). "Solid waste" in turn encompasses "discarded material, including solid, liquid, semisolid, or *contained gaseous material* resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27) (emphasis added).

The RCRA provides for a private cause of action. *See* 42 U.S.C. § 6972. Under the statute, "any person may commence a civil action . . . against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to" the RCRA. 42 U.S.C. § 6972(a)(1)(A). Likewise, "any person may commence a civil action . . . against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any

11

solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

To state a claim of substantial endangerment to health or the environment under § 6972, a plaintiff must sufficiently allege "(1) that the defendant has generated solid or hazardous waste, (2) that the defendant is contributing to or has contributed to the handling of this waste, and (3) that this waste may present an imminent and substantial danger to health or the environment." *Albany Bank & Tr. Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002) (citation omitted); 42 U.S.C. § 6972(a)(1)(B).

A plaintiff bringing an RCRA citizen suit must notify the defendant of the endangerment at least sixty days before suing, and the plaintiff is precluded from suing if "the Administrator or State [in which the alleged violation occurs] has commenced and is diligently prosecuting a civil or criminal action . . . to require compliance" with the regulations. 42 U.S.C. § 6972(b). The court must dismiss the RCRA claim if the plaintiff fails to comply with the statutory notice and delay requirements. *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 33 (1989).

Plaintiffs allege violations of the RCRA at more than a dozen addresses corresponding to manholes and buildings. In terms of the actual conduct at issue, Count 1 alleges that Defendants' gas leaks create an imminent and substantial danger to human health

12

and the environment; Count 2 alleges that the leaks constitute unlawful open dumping by exceeding the methane limitations at facility structures; and Count 3 alleges that the leaks constitute unlawful open dumping by posing a safety hazard to persons and property from fires. As noted above, all three claims depend on treating the leaking gas as "contained gaseous material," which in turn could constitute "solid waste" under the statute. See 42 U.S.C. §§ 6903(5), 6903(27); *United States v. Sims Bros. Const.*, 277 F.3d 734, 740 (5th Cir. 2001) (quoting 42 U.S.C. § 6903(27)) ("For gaseous material to be 'solid waste' it must be 'contained.'"). Plaintiffs contend that the alleged leaks are cognizable under the RCRA because gas that has traveled to an enclosed space is "contained" there, and thus "contained gaseous material" under the RCRA. Defendants argue that Counts 1-3 fail because natural gas leaking from a pipeline is neither "contained gaseous material" nor any kind of "solid waste" within the meaning of the RCRA. The court agrees with Defendants.

Of note, Congress enacted the RCRA in 1976 "with the goal of closing 'the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous waste.'" *Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*, 75 F.4th 248, 256 (1st Cir. 2023) (quoting H.R. Rep. No. 94-1491, pt. 1, at 4 (1976)). In passing the RCRA, Congress was concerned about a "rising tide of scrap,

13

discarded, and waste materials," and the need to "reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices." *Am. Min. Cong. v. U.S. E.P.A.*, 824 F.2d 1177, 1179 (D.C. Cir. 1987) (citing 42 U.S.C. § 6901).  The RCRA itself bespeaks these sentiments where it endorses "solid waste management plans . . . which will promote improved solid waste management techniques," "hazardous waste management practices . . . conducted in a manner which protects human health and the environment," and "the promulgation of guidelines for solid waste collection, transport, separation, recovery, and disposal practices and systems."  42 U.S.C. § 6902.  While not dipositive, it certainly bears noting that the RCRA clearly expresses Congress' desire to use the statute to address the problems associated with the dumping of discarded solid waste and does not, by contrast, evince a clear desire to more broadly address leaks that occur along natural gas pipelines.

More instructively, the Environmental Protection Agency (EPA), the implementing agency for the RCRA, has opined on the meaning of "contained gaseous material" in a way that does not encompass leaking gas from a pipeline.  In the matter of BP Chemicals America Inc., 3 E.A.D. 667 (EAB 1991), a "remand order" concerning whether hydrogen cyanide vapors were considered "solid waste" under the

14

RCRA, the Environmental Appeals Board[3] reviewed various RCRA rules and regulations to conclude that "the Agency views gaseous material to be 'solid waste' only when it is containerized."  BP Chemicals America Inc., 3 E.A.D. 667 (EAB 1991) at *2; *see also* Chemical Waste Management of Indiana, Inc., 6 E.A.D. 144 (EAB 1995) at *12 ("Because the [gases at issue] are not containerized, they would not meet the definition of solid waste and therefore would not constitute hazardous waste.").  In answer to the respondent's argument that the vapors were "contained" insofar as they were held within piping and the plant building as a whole, the Board stated that "the Agency considers such vapors to be outside the scope of the 'solid waste' definition because they are not containerized in the narrower sense of being in an individual container such that the gas is amenable to shipment."  BP Chemicals America Inc., 3 E.A.D. 667 (EAB 1991) at *2.  Thus, by the EPA's own understanding of the term "contained gaseous material" as it appears in the RCRA, a gas was not "contained" by virtue of being enclosed in a building or structure; rather it must at a minimum be held in a container (or "containerized") so as to be capable of being transported as a discrete object.  As such, the EPA has issued precedent undermining the proposition that migrating gas that comes to rest in an enclosed area could properly be viewed as

---

[3] The Environmental Appeals Board is a permanent body within the EPA that, *inter alia*, reviews petitions concerning permits issued under the RCRA in accordance with the statute and applicable regulations.  *See* 40 C.F.R. § 1.25(e)(1).

"contained" or "solid waste" under the RCRA.  The court finds the EPA's treatment of this issue instructive, persuasive, and consistent with the wording and stated purpose of the RCRA.

The court is mindful that "[a]n agency's interpretation of a statute cannot bind a court, but [it] may be especially informative to the extent it rests on factual premises within the agency's expertise."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024).  This echoes a line of Supreme Court precedent endorsing the idea that "courts facing questions the agencies have already answered" may look to "agencies charged with applying a statute [who] necessarily make all sorts of interpretive choices."  *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).  In this way, the EPA's interpretations of terms in the RCRA are not binding but they are "entitled to respect," and they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" proportional to the persuasive power of those interpretations.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, (1944); *see also Loper Bright*, 603 U.S. at 374 (quoting *Skidmore*, 323 U.S. at 140) (noting that when an interpretive issue arises, the court will "go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal.").  Courts can afford weight to the "informed judgment" of an agency according to "the thoroughness evident in its consideration, the validity of its reasoning, its consistency

16

with earlier and later pronouncements, and all those factors which give it power to persuade." *Loper Bright*, 603 U.S. at 370 (quoting *Skidmore*, 323 U.S. at 140).

These factors are present here in the EPA's interpretation of "contained gaseous material" in the matter of BP Chemicals. The EPA's interpretation of "contained gaseous materials" as gas that is at least "containerized in the narrower sense of being in an individual container such that the gas is amenable to shipment" was offered in the context of a formal Environmental Appeals Board decision and following a thorough review of RCRA rules and regulations pertaining to the precise language the court grapples with today. BP Chemicals America Inc., 3 E.A.D. 667 (EAB 1991) at *2; *see also* 42 U.S.C. § 6903(27). Further, this interpretation was used in that same EPA decision to reject the argument that gas contained in a building constituted "solid waste" under the RCRA, which the court finds particularly persuasive here where Plaintiffs make essentially the same argument.

In that regard, Plaintiffs allege that gases that have leaked from Defendants' pipelines can migrate into enclosed spaces, like "tunnels, manholes, ducts, conduits, crawlspaces, electrical service boxes, valve boxes, meter boxes, homes, and buildings," and further that gas has in fact migrated to more than a dozen manholes and buildings. (*See* D. 16, ¶¶ 88, 267-281, 287-299). While Plaintiffs' argument does have some semantic, surface level

17

appeal -- gas that migrates until it stops and collects in a confined space is technically "gaseous material" that is "contained" -- they do not allege that the gas leaks are "containerized in the narrower sense of being in an individual container such that the gas is amenable to shipment." To adopt Plaintiffs' interpretation over the EPA's would read all reasonable limits out of the RCRA and broaden its scope beyond Congress' principal intent to reduce and safely dispose of "discarded" and "unsalvageable" "solid waste".[4]

Accordingly, the court concludes that leaking gas from Defendant's pipeline that has migrated to an enclosed area is not "contained gaseous material" or "solid waste" for purposes of the RCRA. Counts 1-3 therefore fail to assert viable claims for relief and should be dismissed.

## C.    <u>Counts 4-8 - Violation of the PSA</u>

Counts 4-8 allege violations of the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60101-60143. For the reasons explained below,

---

[4] To be clear, some courts have held that escaping gas or vapors can form the basis of an RCRA claim, but those have largely been in instances where the gas was the byproduct of already existing solid waste. *See e.g.*, *Hanford Challenge, United Ass'n of Plumbers & Steamfitters Loc. Union 598 v. Moniz*, No. 4:15-CV-5086-TOR, 2016 WL 11795779, at *3 (E.D. Wash. Nov. 15, 2016) (finding that the RCRA "clearly governs" vapors emanating from solid waste "contained within and leaking from storage tanks"); *Evanston II*, 229 F. Supp. 3d at 718, 722 (permitting RCRA claims where "dense, oily waste materials" degraded into methane gas); *Marcas, L.L.C. v. Bd. of Cnty. Comm'rs of St. Mary's Cnty.*, 977 F. Supp. 2d 487, 506 (D. Md. 2013) (finding that "migrating methane gas" from landfill presents "imminent and substantial endangerment" under RCRA); *New York Communities for Change v. New York City Dep't of Educ.*, No. 11 CV 3494 SJ, 2012 WL 7807955, at *2 (E.D.N.Y. Aug. 29, 2012), *report and recommendation adopted,* No. 11CV3494 SJ CLP, 2013 WL 1232244 (E.D.N.Y. Mar. 26, 2013)(declining to dismiss an RCRA suit for PCBs, "which are in liquid form inside the capacitor").

the court finds that Counts 4 and 5 allege viable violations of the PSA, albeit narrower in scope than as alleged by Plaintiffs, but Counts 6, 7, and 8 do not and should be dismissed.

The PSA aims to "provide adequate protection against risks of life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1). The Act, which is administered by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), prescribes minimum safety standards for leak detection and repair programs. 49 U.S.C. § 60102(q)(1). Through its regulations, the PSA requires that "[h]azardous leaks must be repaired promptly" but provides no further clarification on repair timelines. 49 C.F.R. § 192.703.

As with the RCRA, the PSA provides for a private right of action and permits a plaintiff to bring a civil action for injunctive relief against another person for a violation of its standards. 49 U.S.C. § 60121. Count 4 alleges that Defendants failed to promptly repair 976 hazardous leaks; Count 5 similarly alleges that Defendants failed to immediately commence repair and take continuous action to eliminate 976 hazardous "Grade 1" leaks; Count 6 alleges Defendants failed to timely repair at least 305 nonhazardous "Grade 2" leaks; Count 7 alleges they failed to timely eliminate 67 environmentally significant nonhazardous "Grade 3"

19

gas leaks[5]; and Count 8 alleges that Defendants failed to comply with monitoring and reporting requirements.

Defendants move to dismiss Counts 4-8 on several grounds: (1) § 60121 only permits claims for *ongoing* violations so the claims must be dismissed with respect to any past violations; (2) The PSA only allows claims for violations of state standards that are less stringent than comparable PSA standards, but Counts 5-8 allege violations of state standards that are more stringent; (3) Plaintiffs failed to provide proper notice under the PSA for 74 of the alleged leaks identified; and (4) Plaintiffs' claims are not permitted because an appropriate regulatory authority, the Massachusetts Department of Public Utilities ("DPU"), is already diligently prosecuting the alleged violations.    The court addresses each argument seriatim.

1. Ongoing Violations

The PSA provides that a person may bring a civil action in federal court for an injunction against another person for a violation of the PSA or any of its regulations.    49 U.S.C. § 60121(a)(1).    Defendants observe that, based on Plaintiffs' own representations through their amended complaint, the "overwhelming majority" of the gas leaks Plaintiffs allege in their amended

---

[5] Plaintiffs refer to these leaks as "super-emitter" leaks, but this language does not appear in the regulation they cite to support Count 7.  *See* 220 CMR 114.07.  The court refers to these leaks using the language "environmentally significant nonhazardous Grade 3 leaks," employed by that regulation and defined elsewhere as nonhazardous.  *See* 220 CMR 114.04.

complaint relate to *past* regulatory violations, meaning those gas leaks have been repaired and were not actively leaking at the time Plaintiff filed their amended complaint.  (D. 24 at 5-6; *see also* D. 16-7, D. 16-8, and D. 16-9 (wherein the "status" of some identified leaks is listed as "Repaired" or "Eliminated Otherwise").  Defendants argue that an injunction can address an ongoing violation but cannot address a past violation. Consequently, so Defendants argue, where the PSA provides for injunctive relief only, it should be read to be limited to ongoing violations.

Plaintiffs counter that injunctive relief is permitted for a "pattern of past acts."  They cite for support to the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), a non-environmental case concerning the Fair Credit Reporting Act (FCRA).  The Court noted there in the context of discussing Article III standing that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."  *TransUnion*, 594 U.S. at 435. Analogizing, Plaintiffs argue that the pattern and practice of Defendants' "noncompliant" responses to gas leaks presents such a risk of imminent and substantial harm to the extent they suggest a likelihood of future violations.

The court understands Plaintiffs' argument but does not find it compelling here. For one, the *TransUnion* Court made the referenced observation as dicta in the course of discussing the principal issue there of whether several thousand individuals whose names potentially matched those on a government sanctions list had suffered a concrete injury and thus had standing to bring a class action suit for violation of the FCRA. *Id.* As such, this court does not read *TransUnion* to hold that any plaintiff suing for a violation under any federal statute may also sue for injunctive relief to prevent future violations they believe are imminent based on past violations. Further, the wording of the PSA itself does not appear to contemplate (and thus authorize) a cause of action based on wholly past violations, but rather appears designed to limit the seeking of injunctive relief to an active violation of the regulatory scheme. *See* 49 U.S.C. § 60121(a)(1) ("A person may bring a civil action . . . for *an injunction* against another person . . . for *a violation* of this chapter or a regulation prescribed or order issued under this chapter." (emphasis added)). Accepting Plaintiffs' argument would remove the need for a plaintiff to show actual harm from an actual existing violation and would instead permit them to allege a "pattern of past acts" to sue for injunctive relief to address a potentially nonexistent violation, potentially in perpetuity. A plain reading of § 60121 simply does not contemplate such a scheme. Accordingly, to the

extent Counts 4-8 otherwise survive Defendants' motion to dismiss, they should be limited to include only those leaks that were ongoing at the time of the amended complaint.

2.    More-Stringent Bar

Under the PSA, "a violation of a safety standard or practice of a State is deemed to be a violation of [the PSA]," but "only to the extent the standard or practice is not *more stringent* than a comparable minimum safety standard prescribed under" the PSA. 49 U.S.C. § 60121(c) (emphasis added). Put another way, a violation of a state safety standard that is more stringent than a comparable standard under the PSA is not "deemed to be a violation" of the PSA.

Counts 5-8 allege that Defendants violated Massachusetts regulations set forth at 220 CMR 114.00.[6] Defendants argue that the claims are not viable because these regulations, promulgated by the DPU, are more stringent than the federal safety standards set out under the PSA.

In Count 5, Plaintiffs allege that Defendants failed to undertake "the immediate commencement of repair and continuous action until the conditions are no longer hazardous, the source of the leak is eliminated, and permanent repairs have been completed," citing 220 CMR 114.04(3)(a). The parties agree that for this

---

[6] Count 4 is not implicated by this argument because it does not allege that Defendants violated state regulations. Rather, it alleges that Defendants have failed to promptly repair hazardous leaks as required by the PSA and its regulations. *See* 49 C.F.R. § 192.703(c) ("Hazardous leaks must be repaired promptly.").

Massachusetts standard concerning hazardous "Grade 1" leaks, the comparable federal standard under the PSA requires that "[h]azardous leaks must be repaired promptly."  49 C.F.R. § 192.703(c).  As such, the issue is whether a federal standard that calls for leaks to be repaired "promptly" is more or less stringent than a state standard requiring one to take "immediate" continuous action.

To the court, the terms "immediate" and "promptly" appear to be synonymous in context.  At a minimum, it is not self-evident whether a federal standard calling for repairs to be made "promptly is any more or less stringent than a state standard calling for the "immediate commencement" of repairs.  Both guidelines use language indicating the need to act deliberately and with some urgency, but neither provides a definitive deadline for completion. In urging the court to view the state standard as more stringent, Defendants note that the state guidelines require "continuous" action where the federal standard does not.  They similarly point out that "[o]ne can act promptly, but not immediately," and "engage in prompt repairs even without continuous action." Defendants' observations are not unsound, but they also do not compel the finding that a regulation requiring the immediate commencement of continuous action is unquestionably more stringent than a regulation requiring a leak to be repaired promptly.  *See, e.g.,* Black's Law Dictionary (12th ed. 2024) (defining "prompt" as "done

quickly, immediately . . ." but similarly defining "immediate" as "occurring without delay . . ."). Consequently, the court cannot agree at this juncture that Count 5 should be dismissed.[7]

By contrast, the court finds with respect to Counts 6, 7, and 8 that the state regulations underlying the alleged violations are more stringent than the comparable federal regulations. That is because the PSA simply does not provide comparable standards for the types of leaks referenced in those counts. Count 6 alleges a failure to timely repair nonhazardous "Grade 2" leaks; Count 7 alleges a failure to timely eliminate environmentally significant nonhazardous "Grade 3" gas leaks; and Count 8 alleges a failure to comply with monitoring and reporting requirements referenced in a Massachusetts regulation.

The Massachusetts regulations underlying Counts 6 and 7 define Grade 2 and Grade 3 leaks as "nonhazardous" and establish a repair timeline between one and three years depending on the

---

[7] To be clear, in reaching this conclusion, the court does not endorse Plaintiffs' interpretation of a same-day repair requirement under the PSA. (*See* D. 16, Ex. 7 (indicating "days in violation" as the number of days past the "24 hours of classification date")).

Nor is the court persuaded by Plaintiffs' argument that the state standards at issue should be understood as federal standards in and of themselves. Plaintiffs contend that because the federal Pipeline and Hazardous Materials Safety Administration must certify the state standards under 49 U.S.C. § 60105, the state standards *become* the federal standards. (D. 28, at 27 n.12). As such, so Plaintiffs would argue, there is no need for a "more stringent" analysis, and any violation of any state standard would thus be actionable under the PSA so long as it was certified by the PHMSA. Accepting Plaintiffs' unsupported argument would render § 60121(c)'s "more stringent" enforcement bar meaningless. The court accordingly rejects it.

leak's risk.  220 CMR 114.04(3)(b)-(c) ("A Grade 2 Leak shall be a leak that is recognized as nonhazardous . . . .  A Grade 3 Leak shall be a leak that is recognized as nonhazardous . . . ."); 220 CMR 114.07(2)(a).  In contrast, the federal statute neither defines "nonhazardous" leaks nor establishes a deadline or standard for their repair.  It necessarily follows that the applicable state regulations are more stringent than their federal counterparts, and claims relating to Grade 2 and 3 leaks are thus not actionable under the PSA.

To be sure, Plaintiffs urge the court to find that because the PSA is silent on Grade 2 leaks and environmentally significant Grade 3 leaks, it means that no comparisons can be made at all, which means that there is no way to logically conclude that the state standards are more stringent than the federal standards, which means the claims should survive this particular challenge. (D. 28 at 27, 30).  Plaintiffs' argument is unpersuasive.  Simply put, Counts 6 and 7 rely on state standards that add requirements for nonhazardous leaks that do not exist in the PSA.  Thus, by virtue of their mere existence, these state standards are more stringent than whatever standards may be set out in the PSA. Counts 6 and 7 therefore should be dismissed on this ground.

Count 8 follows a similar route.  Plaintiffs allege Defendants violated the PSA when they failed to comply with Massachusetts monitoring and reporting requirements that have no counterpart in

26

the PSA.  The state regulations require companies to submit leak information in an Annual Service Quality Report, 220 CMR 114.08, whereas the PSA contains no such leak reporting requirement.  The Massachusetts reporting standard is thus necessarily more stringent than the PSA in this regard.  Count 8 should accordingly be dismissed on this ground.

3.    Statutory Notice Requirements

Next, Defendants argue that Plaintiffs failed to provide proper notice of 74 referenced leaks before filing suit.  The PSA requires a plaintiff to give notice of a violation to relevant parties, including the pipeline operator, no less than 60 days prior to filing an action.  49 U.S.C. § 60121(a)(1)(A).  Plaintiffs do not appear to dispute that they did not specify those leaks in the notice they sent Defendants more than 60 days prior to filing suit.  Instead, Plaintiffs argue that they provided adequate notice because the 74 leaks "were of the same character" as those for which Plaintiff did provide timely notice.  (D. 28 at 46).

To support their position, Plaintiffs rely in large part on a Third Circuit Clean Water Act case in which the court found that the plaintiff's failure to provide notice within 60 days of filing suit did not run afoul of the CWA where the plaintiff otherwise provided "sufficient information for the recipients of the notice to identify violations of the same type (same parameter, same outfall)."  *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Hercules,*

27

*Inc.*, 50 F.3d 1239 (3d Cir. 1995).  Analogizing, Plaintiffs argue here that "[a]ll of the post-notice violations alleged in the Amended Complaint are of precisely the same character as those set out in the Notice Letter: same pipeline system, same categories of violations."  (D. 28 at 48).

Notably, however, the Third Circuit defined the phrase "same type" to mean the "same parameter, same outfall" as those CWA violations that had already been properly noticed.  In the parlance of the CWA, this meant that for an otherwise unnoticed violation to fall under the purview of a prior notice letter, it needed to be at a specific location already identified in the prior notice (outfall) and of "a particular attribute of a discharge" (parameter) already noticed at that location.  *Hercules*, 50 F.3d at 1242.  Based on regulations promulgated to implement parts of the CWA, an "outfall" is a specific point at which discharge (e.g., from a sewer system) is added to naturally existing waters (e.g., waters subject to the ebb and flow of the tide).  40 C.F.R. § 122.26(b)(9); *see also* 40 C.F.R. § 122.1; 40 C.F.R. § 122.2; 40 C.F.R. § 120.2.

*Hercules* is thus distinguishable on the facts and does not compel a finding in Plaintiffs' favor on this point.  Even treating the CWA and PSA as analogous, the 74 post-notice violations were still not properly noticed because Plaintiffs do not allege that the 74 leaks occurred in the same specific spot as other leaks

that were adequately noticed. To the extent Plaintiffs argue implicitly that it suffices to allege that a post-noticed leak occurred somewhere in the same pipeline as a properly noticed leak, the court rejects that proposition, as it would permit Plaintiffs to raise new claims for leaks without notice and without specifying where the leaks occurred so Defendants could investigate and potentially remedy them.

The court thus finds that Plaintiffs failed to follow the PSA's 60-day notice requirement in § 60121 with respect to the 74 "post-notice" violations alleged for the first time in the amended complaint. Those alleged violations should thus be removed from the scope of any surviving PSA claims.

4.    Diligent Prosecution Bar

Lastly, Defendants argue that all PSA claims should be dismissed because the DPU is diligently prosecuting all the alleged violations underlying Plaintiffs' complaint. The PSA proscribes private suits where a regulatory authority "has begun and diligently is pursuing an administrative proceeding for the violation."  49 U.S.C. § 60121(a)(1)(B).

According to Defendants, there are three types of "proceedings" that could constitute diligent prosecution for purposes of § 60121: (1) proceedings where the DPU has required Boston Gas to report on lost and unaccounted-for ("LAUF") gas that leaks from the system before reaching customers; (2) a Gas System

29

Enhancement Plan ("GSEP"), overseen by the DPU, aimed at "address[ing] the unsafe consequences of leak-prone pipelines in the long term"; and (3) DPU enforcement proceedings, in particular a proceeding the DPU has labeled "23-PL-27," where Defendants detail that the DPU investigated Boston Gas, reviewed some pipeline leak data from 2017 through 2022, issued a Notice of Probable Violation and subsequent Informal Review Decision that "found that Boston Gas had committed a number of violations, levied a $500,000 civil penalty, and furnished a Consent Order and Compliance Agreement," which the DPU stated 'would put [National Grid] in compliance with the cited federal pipeline safety regulations.'" (D. 24 at 17-21). Defendants rely principally on 23-PL-27 in arguing that Plaintiffs' PSA claims are barred in their entirety.

That said, Defendants clarify that this argument applies only if Plaintiffs' PSA claims are viewed as alleging "systemic" rather than specific violations of the PSA, as the DPU proceedings they cite are not directly tied to the specific violations Plaintiffs allege. (*See* D. 24 at 16). As this court has previously concluded *supra* that any PSA claims should be limited to specific ongoing violations, this argument essentially fails from the start. Independently, the record is insufficiently developed for the court to conclude that the DPU is presently diligently prosecuting the specific violations alleged in Plaintiffs' amended complaint. As Defendants themselves admit, Plaintiffs are suing over

violations that comprise "a subset of leaks . . . that are not individually listed in the LAUF and GSEP proceedings or the DPU's most recent enforcement proceeding, No. 23-PL-27." (D. 24 at 20). This ground therefore does not provide a basis to dismiss any of the PSA claims.

In sum, Counts 4 and 5 assert viable violations of the PSA but the claims should be limited to violations that were ongoing at the time the amended complaint was filed, and both should further be narrowed to exclude the 74 referenced leaks for which proper notice was not provided. In contrast, Counts 6, 7, and 8 should be dismissed.

**D.    Count 9 – Violation of the Public Shade Tree Law**

Count 9 alleges a violation of the Massachusetts Public Shade Tree Law (PSTL). M.G.L. c. 87, §§ 1-14. The PSTL protects "[a]ll trees within a public way or on the boundaries thereof." M.G.L. c. 87, § 1. Under the statute, anyone who "negligently or wilfully [sic] injures, defaces or destroys such a shrub, plant, tree or fixture" shall be liable to "any person for all damages to its or his interest in said shrub, plant, tree or fixture caused by such act." *Id.* § 12. Plaintiffs allege that Defendants' gas leaks have negligently injured or killed at least 210 public shade trees. Defendants raise three arguments in support of dismissal but the court finds that Count 9 alleges a viable claim.

31

First, Defendants argue that the PSTL does not apply to the operation of a gas pipeline or gas leaks because the state legislature did not intend for the PSTL to apply to gas leaks when its predecessor was drafted in 1896. Defendants analogize the present case to a recent one in which the SJC declined "to apply the state's 1960s-era wiretap statute to modern concerns over website tracking." *See Vita v. New Eng. Baptist Hosp.*, 494 Mass. 824 (2024) ("If the Legislature intends for the wiretap act's criminal and civil penalties to prohibit the tracking of a person's browsing of, and interaction with, published information on websites, it must say so expressly."). Applying that reasoning here, Defendants argue that a statute should not be read to apply to later innovations, even where arguably related. *Vita* is inapposite, however, because the supposed innovation here (gas distribution) was present in the 1820s, many decades before any part of the PSTL was originally drafted in 1896. (*See* D. 24-1 at 89 (describing creation of Boston Gas Light Company in 1822)). Thus, there is a basis to infer that the original authors of the PSTL were likely aware of gas distribution lines at the time the statute was drafted, unlike the authors of the state wiretapping statute in *Vita*.

Defendants argue next that the PSTL allows for an action against one who "injures, defaces or destroys" trees, and as such targets only those who physically alter trees, not those who damage

them from pollution.  *See* M.G.L. c. 87, § 12.  The court does not agree with this narrow reading of the statute.  Language preceding the phrase relied on by Defendants provides more broadly for a claim against anyone who "*by any other means* negligently or wilfully injures, defaces or destroys" trees.  *Id.* (emphasis added). The court finds this language sufficient to encompass one who negligently injures a tree through some non-physical means, such as by subjecting it to air pollution.

Third, Defendants contend that the vagueness of the law's application to gas leaks militates against its application according to the rule of lenity.  Underlying this argument is the notion that the government owes fair notice to Defendants about what actions are forbidden under the PSTL.  However, the rule of lenity applies most directly to criminal actions, and in particular to statutes that are ambiguous.  *Soto-Hernandez v. Holder*, 729 F.3d 1, 5 (1st Cir. 2013) ("[W]e have consistently limited the application of the rule of lenity to criminal statutes."); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011). As intimated above, the PSTL is not ambiguous where it clearly applies to any form of damage against trees.  Again, the PSTL provides that "[w]hoever . . . negligently or wilfully injures, defaces or destroys such a shrub, plant, tree or fixture shall . . . be liable to . . . any person for all damages to . . . his interest in said shrub, plant, tree or fixture caused by such act."  M.G.L.

33

c. 87, § 12.   Accepting all allegations as true, Plaintiffs sufficiently plead that Defendants negligently damaged or destroyed at least 210 public shade trees.

Accordingly, the court finds that Count 9 states a viable claim.

**E.    Count 10 – Violation of the Environmental Citizen Suit Statute**

Count 10 alleges a violation of the Massachusetts Environmental Citizen Suit Statute ("ECSS").  M.G.L. c. 214, § 7A. Under the statute, groups of at least 10 persons residing within Massachusetts may bring a civil action against any person who has caused, alone or with others, "any destruction, damage or impairment, actual or probably, to any of the natural resources of the commonwealth."  *Id.*  Plaintiffs must allege (1) damage to the environment is occurring or is about to occur and (2) that the damage is "a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment."  *Id.*  Additionally, plaintiffs are required to provide written notice to anyone violating the statute at least 21 days before commencing an action against them.  *Id.*

Plaintiffs here contend that "Defendants have violated, are violating, and will continue to violate RCRA [sic], the PSA, and the Massachusetts Public Shade Tree Law, the major purposes of which are to prevent or minimize damage to the environment."

34

(D. 16 at ¶ 347).  Defendants argue that Count 10 fails because Plaintiffs cannot show that the "major purpose" of each of these statutes is to prevent or minimize damage to the environment. Defendants argue further that Plaintiffs have failed to properly notice the alleged PSTL violations for purposes of the ECSS.

Regarding purpose, the RCRA undeniably has as a major purpose the protection of the environment, and Defendants do not seriously argue otherwise.

Regarding the Pipeline Safety Act, it is clear from the Act's name alone that its primary purpose is pipeline safety rather than protection of the environment.  True, the statute does bespeak a level of concern for the environment where it provides that its standards are designed to meet "the need for (i) gas pipeline safety, or safely transporting hazardous liquids, as appropriate; and (ii) *protecting the environment*."  49 U.S.C. § 60102(b)(1)(B) (emphasis added).  This allusion aside, however, it is apparent to this court that the PSA is designed primarily to promote pipeline safety or the safe transportation of potentially hazardous materials through pipelines, and secondarily to protect the environment from the risks associated with said transportation. As such, the court cannot agree that "the major purpose" of the PSA is to protect the environment.

Finally, regarding the PSTL, Defendants assert that its major purpose is "municipal governance, not environmental protection."

The court disagrees.  The PSTL has as its stated purpose the protection of "public shade trees," defined as "[a]ll trees within a public way or on the boundaries thereof."  M.G.L. c. 87, § 1. The court finds this focus to reflect a goal of protection of a portion of the environment.  While the statute does have a component establishing the position of "Tree Warden," the purpose of that provision, as well as the position itself, appears to be to further "the care and control of all public shade trees" and the "preservation of such trees, shrubs and growths."  *Id.,* § 2. Further, the statute provides remedies for the injury, defacement, or destruction of public shade trees, reflecting the protection of trees as its principal goal.  M.G.L. c. 87, § 12.

Defendants argue that Plaintiffs regardless failed to properly provide Defendants with written notice of PSTL violations at least 21 days before filing suit as required by the ECSS. Defendants do not dispute that they received Plaintiffs' "Notice of Intent" at least 21 days prior to Plaintiffs filing suit, but argue that the notice was insufficient where it did not include the specific location of any of the allegedly damaged trees. (D. 24 at 27-28).  Plaintiffs appear to concede this point where they argue only that Defendants had "actual notice" since November 12, 2024, when Plaintiffs filed this lawsuit.  (*See* Exhibit 10 to Plaintiffs' Original Complaint, "Damaged and Dead Trees," D. 1-10).

The court finds on balance that while Plaintiffs in hindsight should have provided more specific information than they did, they did provide timely notice of their intent to sue Defendants under the ECSS.  Further, while the substance of the notice was too vague to alert Defendants to the trees they reportedly impacted, Defendants do not suggest that they intended to use the notice period to remedy any alleged violations of the PSTL and thereby obviate the need for litigation.  Defendants' point regarding the vague nature of the notice is well taken but that deficiency is not so glaring here as to warrant dismissal of the claim.

The court finds that Count 10 pleads a viable claim.

## F.    Counts 11-13 - Common Law Claims

Finally, Plaintiffs raise three common law claims: negligent harm to public shade trees (Count 11), public nuisance by way of damaging and destroying public shade trees (Count 12), and public nuisance by way of causing the imminent risk of explosion and fire (Count 13).

### 1.    Negligence

Count 11 alleges that Defendants negligently harmed public shade trees.  To prevail in a negligence action under Massachusetts law, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached that duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused the damage. *Williams v. Steward Health Care*

*Sys., LLC*, 103 N.E.3d 1192, 1196 (Mass. 2018) (quoting *Jupin v. Kask*, 849 N.E.2d 829, 834-35 (Mass. 2006)).  Plaintiffs allege that (1) Defendants owed a duty of care to Plaintiffs to "maintain[] their gas pipelines and respond[] to gas leaks in a way that does not harm public shade trees"; (2) Defendants breached that duty by failing to exercise reasonable care to "properly maintain their gas pipelines and eliminate gas leaks that damage and kill public shade trees"; (3) damage to public shade trees resulted; and (4) that damage was caused by Defendants' negligent maintenance of their gas pipelines.  To the extent Plaintiffs' negligence claim appears to be inextricably intertwined with their PSTL claim, it is; they tellingly argue that they have standing to sue Defendants for negligence because "the PSTL recognizes a legally cognizable interest in public shade trees and creates a private right of action to protect that interest."  (D. 28 at 32). As such, Plaintiffs' negligence claim at core pleads a violation of the PSTL.  The claim fails for at least two reasons.

First, "in the absence of an independent duty, a plaintiff cannot proceed with a negligence claim based solely on a statutory or regulatory violation."  *See MacKenzie v. Flagstar Bank, FSB*, 738 F.3d 486, 496 (1st Cir. 2013); *see also Penney v. Deutsche Bank Nat'l Tr. Co.*, No. 16-CV-10482-ADB, 2017 WL 1015002, at *6 (D. Mass. Mar. 15, 2017) ("Thus, any theory of negligence based solely on a violation of a statute, rule, or regulation—without an

38

independent duty—fails under Massachusetts law."). Accordingly, Plaintiffs cannot sue Defendants for negligence based on a purported violation of the PSTL.

Second, and relatedly, where the legislature creates a new right or duty that did not previously exist at common law and is "wholly the creature of statute," that statute provides the sole remedy for a breach and bars any common law claims for the same conduct. *See Sch. Comm. of Bos. v. Reilly*, 285 N.E.2d 795, 798 (Mass. 1972) (quoting *Sch. Comm. of City of Lowell v. City of Lowell*, 164 N.E. 91, 93 (Mass. 1928)); *see also O'Leary v. New Hampshire Boring, Inc.*, 323 F.R.D. 122, 127 (D. Mass. 2018) (common law negligence claim alleging failure to pay prevailing wage was barred where the legislature passed a statute to address the same conduct). As noted, the PSTL provides Plaintiffs with recourse to seek relief for any violations of the statute that harmed them. As no such right appears to have existed prior to the PSTL's enactment, the statute is meant to be the exclusive vehicle for obtaining relief for any infractions of it. The negligence claim is unnecessarily duplicative and therefore may not go forward. *See George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 188 (D. Mass. 2012) (quoting *DePina v. Marriott Int'l, Inc.*, No. SUCV200305434G, 2009 WL 8554874, at *13 (Mass. Super. July 28, 2009)) ("plaintiffs' common law claims are mere surplusage [where]

they needlessly duplicate the remedies available under the statute").

Count 11 should therefore be dismissed.

2.    Public Nuisance Claims

Plaintiffs bring two claims for public nuisance: Count 12 is based on Defendants' alleged damage to public shade trees and Count 13 is based on the imminent risk of fire and explosion posed by certain identified leaks.  Whereas a private nuisance pertains to non-trespassory invasions of another's interest in the *private* use and enjoyment of land, a public nuisance tortfeasor "interferes with the exercise of a public right by directly encroaching on public property or by causing common injury." *Ryan v. Greif, Inc.*, No. 22-CV-40089-MRG, 2023 WL 5979711, at *38 (D. Mass. Sept. 1, 2023), report and recommendation adopted in part, rejected in part, 708 F. Supp. 3d 148 (D. Mass. 2023) (rejected on other grounds). Private plaintiffs may bring a public nuisance claim when "the public nuisance has caused some special injury of a direct and substantial character other than that which the general public shares." *Id.* (quoting *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 858 N.E.2d 699, 716 (Mass. 2006)). Plaintiffs argue for each public nuisance claim that they have such a "special injury" that is "different in kind and degree, from the general public."

40

a.   Damage and Death of Public Shade Trees

Regarding Count 12, Plaintiffs plead that the damage and death of shade trees caused by Defendants' gas leaks interferes with "rights general to the public, including public health, public safety, public peace, public comfort, and public convenience," citing examples such as diminished aesthetic, recreational, and health value.   (D. 16 at ¶ 360).   Plaintiffs fail, however, to sufficiently plead a true "special injury" particular to them.

In this regard, Plaintiffs aver that they "suffer special injuries from damaged and dead trees that are of a different kind from those suffered by the rest of the public" because they "live, work, and recreate near the damaged and dead trees," and because they "allocate resources to protect and plant trees and to research and mitigate the heat island effect."   In the court's view, neither of these stated grounds constitutes a "special injury" in the context of Defendants' alleged harm to the identified shade trees. As Defendants point out, living, working, and recreating near these public shade trees reflects a benefit enjoyed by countless others in the community and in no way distinguishes Plaintiffs from the public.   Further, while the court credits that Plaintiffs' stated goal of protecting and planting more trees could be impacted by Defendants' conduct, that harm cannot be said to be a special injury to Plaintiffs "of a direct and substantial character."

41

Plaintiffs argue that they have also suffered a "special injury" in the form of devaluation of their properties due to proximity to the lost shade trees. Plaintiffs compare their position to that of the homeowner plaintiffs in *Ryan v. Greif*, in which the court found that plaintiffs had sufficiently pleaded a special harm to survive a motion to dismiss. *Ryan*, however, is easily distinguishable. In *Ryan*, the "special harm" that gave rise to a claim for public nuisance brought by private plaintiffs was exposure to PFAS6, supported by "abnormally high PFAS concentration readings in blood samples" of named Plaintiffs. *Ryan*, 2023 WL 5979711, at *4. While the court acknowledged it was unclear from the pleadings whether and to what extent every resident of the plaintiffs' town would suffer from PFAS contamination, it was persuaded by the specificity of the harms alleged (e.g., plaintiffs "cannot eat the fruits and vegetables from their gardens or the eggs produced by their chickens") and the extent to which the alleged public nuisance "has impacted Plaintiffs' homes." *Ryan*, 2023 WL 5979711, at *39. Plaintiffs make no such allegations here.

Count 12 therefore should be dismissed.

b.    Imminent Explosion and Fire Risks

Regarding Count 13, Plaintiffs plead that they suffer special injuries different from those suffered by the general public insofar as "1) Plaintiffs live, work, and recreate near Defendants'

gas leaks that pose an imminent explosion and fire risk, and 2) Plaintiffs allocate resources to spread awareness about the harms of Defendants' gas leaks, testify in proceedings related to natural gas infrastructure, and research and mitigate natural gas pollution." Moreover, Plaintiffs plead that a gas leak caused two 200-pound manhole covers to explode in the Financial District in 2022 and allege there are 26 specific leaks that pose an imminent risk of explosion and fire "in the Affected Neighborhoods" of Plaintiffs. (D. 16 at ¶¶ 105, 364).

While it remains to be seen whether the facts match the rhetoric, the court finds at this juncture that Count 13 pleads a valid public nuisance claim to the extent it alleges that Plaintiffs are genuinely in close proximity to specific identified leaks that present an imminent risk of explosion or fire.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss should be **<u>GRANTED IN PART</u>** and **<u>DENIED IN PART</u>**. Specifically, the motion should be granted with respect to Counts 1–3, 6–8, 11, and 12, and should be denied with respect to Counts 4, 5, 9, 10, and 13. With respect to Counts 4 and 5, which allege violations of the PSA, the scope of those claims should be narrowed to include only alleged violations that were ongoing at the time the amended complaint was filed, and should exclude the 74 alleged leaks for which notice was not timely provided. With respect to Count 10,

which alleges a violation of the ECSS, the scope of the claim should be narrowed to include only the PSTL as its basis.


                                    /s/ Donald L. Cabell
                                    DONALD L. CABELL, U.S.M.J.

DATED: March 25, 2026