**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.; GREENROOTS, INC.; MOTHERS OUT FRONT, INC.; CATHERINE BORDON; KATHERINE CALANDRIELLO; CLAIRE CORCORAN; JUDITH FOSTER; SARAH FREEMAN; RIENA HARKER; ROBERT KENDALL; WENDA KOCHANOWSKI; JOHN KYPER; STEPHEN LIN; JOHN LYONS; ROY SMITH; DENNIS SULLIVAN; CARLTON WILLIAMS; TIMOTHY WILLIAMSON, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL GRID USA; BOSTON GAS COMPANY d/b/a/ NATIONAL GRID; NATIONAL GRID USA SERVICE COMPANY, INC., <br><br> Defendants. | Case No. 1:24-cv-12830-GAO |

**PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION ON DEFENDANT BOSTON GAS COMPANY'S MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs respectfully object in part to the Magistrate Judge's Report and Recommendation, ECF No. 41 ("R&R"),[1] on Boston Gas Company's Motion to Dismiss, ECF No. 20. The R&R correctly concludes that Counts 4 and 5 allege viable claims under the Pipeline Safety Act, but it errs by: (a) limiting those Counts to only leaks alleged to be ongoing at the time of the Amended Complaint, ECF No. 16; and (b) excluding 74 leaks on notice grounds. These constraints, particularly in combination, would make citizen suit enforcement of the

---

[1] For docketed entries throughout, pin cites refer to ECF pagination.

1

Pipeline Safety Act's requirements nearly impossible. The R&R also errs in dismissing Count 12, because diminution of nearby property values is a qualitatively different harm than the public's general loss of shade or enjoyment. Plaintiffs do not object to the remainder of the R&R. [2]

## STANDARD OF REVIEW

An adversely affected party may contest an R&R by filing a timely, substantive objection. *Torres-Santiago v. United States*, 865 F. Supp. 2d 168, 175 (D.P.R. 2012). District Courts review such objections *de novo*. *Id.* (citing *Bonefont–Igaravidez v. International Shipping Corp.*, 659 F.3d 120 (1st Cir. 2011) and *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006)).

## ARGUMENT

I.    **THE REPORT AND RECOMMENDATION ERRS IN LIMITING COUNTS 4 AND 5 IN A MANNER THAT WOULD THWART PIPELINE SAFETY ACT ENFORCEMENT, UNDERCUTTING THE INTENT OF THE CITIZEN SUIT PROVISION.**

The R&R correctly recommends allowing Counts 4 and 5 to proceed but improperly narrows them. First, the R&R excludes any violations that were repaired (or "otherwise eliminated") before the Amended Complaint was filed, which mistakenly treats the violations as resolved and applies the wrong standard. Second, the R&R excludes all post-notice violations, which again applies the wrong standard. The impact of these two limitations reduces citizen suit enforcement to a near nullity, which is the opposite of what Congress intended.

---

[2] Plaintiffs do not object to the dismissal of Count 11 but note, consistent with the R&R, that Count 11's theory is incorporated into the Public Shade Tree Law ("PSTL") claim; should the Court decline to adopt the R&R's recommendation on the PSTL claim, plaintiffs who own affected trees should be permitted to pursue their negligence claim.

**A.    Injunctive Relief is Available for Environmental Violations Where There is a "Continuing Likelihood" of Repeated Violations.**

The R&R's limitation on Counts 4 and 5 to only leaks that were ongoing at the time of the Amended Complaint is contrary to established law. Citizen suits may proceed—even if particular violations have resolved—where the plaintiff alleges that there is a reasonable likelihood that a past violator will continue to violate in the future. *E.g.*, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987) (Clean Water Act case); *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 92 (1st Cir. 2025) (Clean Air Act case); *Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir. 1986) (Clean Water Act case). Although the language of the Clean Water Act and Clean Air Act each vary slightly from that of the Pipeline Safety Act, cases construing the citizen suit provisions of the Acts are nevertheless instructive when determining the availability of injunctive relief.[3]

The language in the Clean Water Act is the most restrictive: citizen suits are authorized against those alleged "to be in violation" of the statute, 33 U.S.C. § 1365(a)(1), interpreted to mean an allegation of an ongoing violation at the commencement of suit. *Gwaltney*, 484 U.S. at 64. *Gwaltney* holds that citizen suits may proceed where a plaintiff alleges "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57, 63 (" … an intermittent polluter—one who violates permit limitations one month out of every three—is just as much 'in violation' of the Act as a continuous violator."); *Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir. 1986) (holding a Clean Water Act citizen suit "may go forward if the citizen-plaintiff

---

[3] *See* 33 U.S.C. § 1365(a)(1) (authorizing citizen suits against those alleged "to be in violation" of the Clean Water Act); 42 U.S.C. § 7604 (authorizing citizen suit "against any person … who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of …" the Clean Air Act); 42 U.S.C. § 60121(a) (authorizing citizen suits "for a violation" of the Pipeline Safety Act).

fairly alleges a continuing likelihood that the defendant, if not enjoined, will again proceed to violate the Act."). Therefore, even the Clean Water Act would not bar every leak a polluter fixes on the eve of filing when a history of regular recurrence is alleged.

The language in the Clean Air Act is also restrictive, allowing citizen suits only where there are allegations of ongoing or repeated violations. *See* 42 U.S.C. § 7604. In a Clean Air Act case regarding instances of bus idling, the First Circuit held that "[e]vidence of twenty-six days of daily violations substantiates CLF's inference that Academy illegally idles 'each and every day that its buses are in operation[.]'" *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 92 (1st Cir. 2025). There, as here, Plaintiffs' "complaint is best read as alleging a pattern or practice of unlawful idling, rather than a series of isolated incidents." *Id.*

The Pipeline Safety Act's language is broader than the Clean Water Act or the Clean Air Act's. The Pipeline Safety Act requires only "a violation" of the statute or its regulations and does not include any temporal conditions on those violations. 49 U.S.C. § 60121(a)(1). The Court should not add such conditions. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) (declining to read a time limitation into an immigration statute because a court "must *interpret* the statute, not rewrite it." (emphasis supplied)). Given that Plaintiffs' allegations here would suffice under the narrower statutory language in the Clean Air Act and Clean Water Act, they undoubtedly meet the broader Pipeline Safety Act standard.

Here, the facts show a history of specific and repeated violations, including those that were ongoing at the time of filing, demonstrating a "continuing likelihood" of more violations. *See* R&R at 22–23, ECF No. 24 at 5.[4] Plaintiffs allege years' worth of violations that have

---

[4] Importantly, the violations of the Pipeline Safety Act that CLF alleges are not the leaks themselves, but Defendants' 976 failures to timely repair them. Am. Compl., ECF No. 16 at ¶ 312; Ex. 7 to Am. Compl., ECF No 16-7. So, whether Defendants eventually repaired a particular leak is not sufficient to show that the violation—failure to *timely* repair the leak—has been resolved. Indeed, the long history of delayed

repeated.[5] Am. Compl. ¶¶ 260, 263, 266–81, 286–99, 308–09, 318, 321; ECF No. 16-7. The repeated failures to timely repair leaks would suffice under the "intermittent polluter" model of the Clean Water Act or the "repeated violations" or "pattern and practice" models of the Clean Air Act. The history and continued threat of repeated violations, as in *Pawtuxet*, fairly alleges a "continuing likelihood" that Defendants, "if not enjoined, will again proceed to violate the Act." *See* 807 F.2d at 1094. Finally, because Defendants only submit data on their leaks quarterly, Plaintiffs could not include up-to-the-minute data on the leaks that continued or began since the Amended Complaint was filed, but their self-reported data shows the violations continue.[6]

The R&R expresses concern that allowing Plaintiffs to allege a pattern and practice of violations "would remove the need for a plaintiff to show actual harm from an actual existing violation and would instead permit them to allege a 'pattern of past acts' to sue for injunctive relief to address a potentially nonexistent violation, potentially in perpetuity." R&R at 22. But those are not the facts here. Here, the pattern alleged is based on specific instances of violations that amount to a pattern that continues to the present—not a general assertion of a historical pattern untethered from the Plaintiffs' injuries. It also overlooks the critical point that there *are* undisputedly allegations of existing violations here. ECF No. 24 at 5; R&R at 22–23.

---

repair times and noncompliant repairs show that these violations have *not* resolved. The Defendants here do not meet the high bar to show that Plaintiffs' claims are mooted. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (announcing a "stringent" standard for mootness based on a defendant's voluntary conduct: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.") (internal citations omitted).

[5] Plaintiffs also allege that Defendants' leak repairs have a failure rate of 43%—meaning leaks reappear at the same sites. Am. Compl. ¶ 161. So, not only do Defendants' practices that lead to the violations continue, but the underlying leaks at issue have sprung open again and could do so again at any time.

[6] Determining whether a defendant is an intermittent violator or if it has come into compliance would require a degree of prognostication, if it were not for the fact that post-notice (and post-Amended Complaint) violations show that the Defendants have not come into compliance. These repeated violations show that the violations at issue are not "wholly past"—they are intermittent and therefore continuing.

Finally, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) sheds light on when a plaintiff may seek an injunction, and the rationale in *TransUnion* is consistent with the outcome in the environmental cases above: where there is a continuing risk of harm, a plaintiff has standing for injunctive relief.

**B.      The R&R Errs in Dismissing Post-Notice Violations.**

Because Plaintiffs' notice letter was sufficient to put Defendants on notice of their ongoing violations, the R&R errs in dismissing the 74 post-notice violations. Notice of a citizen suit only requires reasonable specificity and is understood to include post-notice violations of the same type. *See Paolino v. JF Realty, LLC*, 710 F.3d 31, 37–38 (1st Cir. 2013); *Pub. Int. Rsch. Grp. of N.J., Inc. v. Hercules, Inc.,* 50 F.3d 1239, 1251 (3d Cir.1995) ("*Hercules*") ("Because a citizen must delay filing suit for at least 60 days after notice has been sent, it is foreseeable that a complaint will include allegations of more recent violations in an effort to establish 'continuous or intermittent violations.'"). The First Circuit held, when considering the nearly identical Clean Water Act notice provision, that notice "does not require … that a citizen plaintiff 'list every specific aspect or detail of every alleged violation,' or 'describe every ramification of a violation.'" *Paulino*, 710 F.3d at 38 (quoting *Hercules*, 50 F.3d at 1248). Considering the implementing regulation for the Clean Air Act's notice provision, the District of Maine held that while a notice must "provide sufficient information to permit the alleged violator to identify the standard allegedly violated, the activity that caused the alleged violation, the location of the alleged violation and the person responsible for the violation," the notice *itself* did not have to "specifically identify each of these items." *City of Biddeford v. Maine Energy Recovery Co., LP*, 323 F. Supp. 2d 111, 113 (D. Me. 2004).

Citizen suit notice letters related to fugitive emissions that violate the Clean Air Act are

particularly apt here, where leaks occur throughout Defendants' system, rather than at numbered outfalls or stacks. In *City of Ashtabula v. Norfolk S. Corp.*, plaintiffs alleged that defendants violated a limit on emissions into open air by failing to take action to prevent coal dust storms. 633 F. Supp. 2d 519, 528 (N.D. Ohio 2009). The plaintiffs' notice was sufficient where it described the specific standard being violated and alleged that violations had occurred daily. *Id.* In *Sierra Club v. Energy Future Holdings Corp.*, the plaintiff's notice alleging particulate matter and opacity violations was sufficient where it provided opacity readings with dates and times and stated that the power plant's two units were both "believed to be in violation." 921 F. Supp. 2d 674, 683 (W.D. Tex. 2013); *cf. United States v. Borden, Inc.*, 572 F. Supp. 684, 685 (D. Mass. 1983) (ruling emissions of chloride gas that "occur at various points" in the manufacturing process at issue were subject to enforceable emission standards).

Here, Plaintiffs' notice letter was more than sufficient. The notice identified the specific regulations at issue and listed 921[7] instances of specific violations of those regulations, complete with a table showing, for each violation: Defendants' own leak identification number, the address of the leak, the grade and status of each leak, the number of days the leak sat unrepaired, and the number of days Plaintiffs alleged Defendants were in violation of the regulation for that leak. ECF No. 16-4 at 17–18, 25–43. The notice explained what Plaintiffs believed constituted a violation of the regulations: where more than 24 hours elapsed between the classification of a Grade 1 leak and its repair. ECF No. 16-4 at 25. The notice letter specified that it covered leaks in the "affected neighborhoods" and explicitly identifies those neighborhoods. *Id.* at 3. The notice also stated that future violations of the same type would be included in this suit. ECF No.

---

[7] The Amended Complaint alleges 976 violations because it accounts for violations that Plaintiffs were able to identify from publicly available data that occurred during the notice period. Am. Compl. ¶¶ 308, 312. The total numbers shown in the illustration on page 9, below, are different still because that illustration includes data that was not public until after the Amended Complaint was filed.

16-4 at 21 ("Plaintiffs hereby provide this notice for past and continuing violations outlined above and for continuing violations after this notice. Additional information, including information in Plaintiffs' possession, may reveal further details and violations. This Notice Letter covers such violations.").

Defendants can and readily do identify instances in which it took them more than 24 hours to repair a Grade 1 leak in the identified neighborhoods, as they routinely compile this information to comply with DPU requirements. Indeed, in order to identify the violations in this case, Plaintiffs rely on the information compiled by Defendants. The Defendants had sufficient information in the notice letter to determine whether their actions would be subject to suit, and that is sufficient notice under the law. Defendants were on notice that every such instance falls within the ambit of Plaintiffs allegations and are subject to suit.

Requiring details like the addresses of post-notice leaks sets an unworkable standard that has never been required. As Defendants' violations continue throughout the notice period and throughout the litigation, Plaintiffs would have to send a new notice and amend their complaint each quarter as Defendants release new data. Violations identified during discovery arguably would require new notice as well. The recommended approach to notice would make enforcement of ongoing conduct impossible because it would require an endless cycle of notice, amendment, and re-notice.

C.    **The Combined Effects of the R&R's Recommendations on Active Leaks and Notice Undercut Citizen Enforcement Almost Entirely.**

According to the R&R, plaintiffs may only enforce failures to timely repair leaks that were still leaking at the moment of filing and any leaks occurring after the notice must be re-noticed to be enforceable. This undercuts citizen enforcement and leads to the absurd result shown in the image below:

|  | Notice Letter Sent Feb. 28, 2025 | Amended Complaint Filed May 20, 2025 |
|---|---|---|

Number of Grade 1 leaks where repair took over 24 hours:

| 921 | 56 | 149 |
|---|---|---|

Approximate number of violations Plaintiffs
could enforce under R&R's restrictions: 9–18

Of the 1,126 Grade 1 hazardous leaks that the Defendants took more than 24 hours to repair

between March 2019 and December 2025 (the most recent publicly available data), Plaintiffs

would only be able to enforce between 9 and 18 instances under the R&R's proposed heightened

standards.[8]

Defendants share leak data with the regulator quarterly, so a new Grade 1 leak could be

leaking, unrepaired, for as many as three months before Plaintiffs become aware of it. Then,

under the recommended heightened notice standard, Plaintiffs would have to send a new notice

letter and wait 60 days before amending their complaint to add the violation. If the Defendants

were to repair that leak, Plaintiffs would then run afoul of the R&R's recommendation that any

leak that was repaired before filing an amended complaint is unenforceable. As noted above,

*supra* at 4 n.4, repairing the leak does not mean the Defendants have come into compliance with

the regulation, only that the particular underlying leak has been patched.[9] But, if the Court

---

[8] It is not entirely clear based on publicly available data how many leaks from the notice period were still leaking the day Plaintiffs filed their Amended Complaint. Plaintiffs based this estimate on their review of the data from Defendants' publicly available leak reports, *see* ECF No. 16-7, and Defendants' assertions in its Memorandum, ECF No. 24 at 5, 5 n.3.

[9] The function of these rules working together threatens to make failures to timely repair gas leaks the type of violation that is "capable of repetition yet evading review." This exception to the mootness doctrine requires a party to show "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Pub. Utilities Comm'n of the State of California v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001) (cleaned up).

adopts the R&R without modification, Defendants could take as long as five months to repair each hazardous leak—which are required to be repaired "immediately"—and nevertheless defeat any citizen plaintiff at the courthouse steps, avoiding any enforcement whatsoever for their late repair.

The standards recommended in the R&R, particularly working in conjunction, are both contrary to established law and narrow the scope of the citizen suit provision to a near nullity. The Defendant would not be coming into compliance with the requirement to repair leaks "promptly," but it would successfully evade review. Here, these recommendations would reduce the number of enforceable violations from 1,126 and counting to perhaps as few as 18. *See* ECF No. 16-7; ECF No. 24 at 5, 5 n.3. That would undercut the purpose of the citizen suit provision, which is to augment agency enforcement. *See, e.g.*, *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987) ("A citizen plaintiff, when bringing an enforcement action, supplements the enforcement power of the EPA. … [I]n those suits citizen plaintiffs effectively stand in the shoes of the EPA.") (cleaned up).

## II.   THE REPORT AND RECOMMENDATION ERRED IN GRANTING DEFENDANTS' MOTION TO DISMISS COUNT 12.

In Massachusetts, "[t]o assert a public nuisance claim, a private plaintiff must show that that the public nuisance has caused the plaintiff some special injury of a direct and substantial character other than that borne by the general public." *Lewis v. Gen. Elec. Co*., 37 F.Supp.2d 55, 61 (D. Mass. 1999) (quoting *Planned Parenthood League of Mass., Inc. v. Bell*, 424 Mass. 573, 578 (1997)). It is well established that economic harm constitutes a special injury of a direct and substantial character when suffered by plaintiffs located near the nuisance locus. *Id*. (plaintiff's inability to sell nearby property represented special injury of a direct and substantial character). Moreover, economic loss can be a special injury of a direct and substantial character, even when

there is no physical intrusion upon plaintiff's land. *Nalley v. Gen. Elec. Co.*, 165 Misc.2d 803, 811–812, 630 N.Y.S.2d 452 (Sup. Ct. 1995); *see also Wright v. Lyons*, 224 Mass. 167 (1916).

### A. Economic Harm Is a "Special Injury" of the Plaintiffs, Who Own Homes Near The Damaged and Dying Shade Trees.

#### 1. When all the allegations in the amended complaint are credited, special injury is alleged.

In Count 12, Plaintiffs allege that gas leaks in their neighborhood are a public nuisance because they cause death and damage to public shade trees, resulting in the public's loss of recreational pleasure and health benefits associated with shade trees. Am. Compl. at ¶ 360. They also allege that the Plaintiffs who live near the trees suffer loss in the value of their properties. *Id*. ¶ 184. Despite the distinct, direct injury suffered by the Plaintiffs, the R&R determined that their injury is not a "special injury" that is "different in kind and degree[] from the general public."

The R&R is based on an incomplete articulation of the Plaintiffs' "special injury." The R&R references public injuries, R&R at 41, but disregards the allegations of unique harm the residential Plaintiffs in this case suffer. The Amended Complaint states that the Plaintiffs who live near the shade trees that are lost or damaged suffer diminution of property value. Am. Compl. ¶ 184 and n.63. While the R&R acknowledges that the Plaintiffs argued this point, R&R at 42, the Court does not credit it as an allegation in the Amended Complaint. Because economic loss was well pleaded in the Amended Complaint and constitutes a "special injury" under Massachusetts law, Defendants' motion to dismiss Count 12 cannot be granted.

#### 2. Only a few members of the public are alleged to have suffered economic harm.

The reasons in the R&R for rejecting economic loss as a special injury are not entirely clear. It is possible to read the R&R as saying that economic loss, even if credited as an allegation, does not satisfy the special injury requirement because such loss is alleged to be

suffered by everyone in the community. If so, this also is a misreading of the allegations in the

Amended Complaint. Plaintiffs allege that they live near the damaged trees. Am. Compl. ¶ 184

("nearby damaged trees negatively affect property values"). Members of the community who do

not live near the trees suffer the community wide impacts (loss of health and recreational

benefits), but not the economic loss. In short, Plaintiffs are alleging that they suffered an injury

that has not been suffered by the wider public.[10] For purposes of a motion to dismiss, such an

allegation must be taken as true. *Rafferty v. Merck & Co., Inc*., 479 Mass. 141, 147 (2018).

### 3.    Plaintiffs can maintain a private nuisance claim.

Finally, Plaintiffs are entitled to move forward on their nuisance claim because it can be

treated as a private nuisance if it falls short of the standard for a public nuisance.[11] A plaintiff's

public nuisance claim may proceed as a private nuisance claim where the plaintiff suffers a

personal harm from the nuisance. *See, e.g.*, *Wesson v. Washburn Iron Co*., 95 Mass. 95 (1866).

In *Wesson*, the defendant's operations emitted smoke and cinders and shook buildings in the

area. Plaintiff brought a nuisance claim against the defendant alleging that the smoke and cinders

interfered with and reduced the value of her lodgings business. The defendant argued that the

plaintiff could not maintain the action because "many other houses in the neighborhood were

affected in a similar way." *Id.* at *98. Despite the court recognizing the principle that a public

nuisance action requires the showing of a special injury, it found that such principle did not

apply and that a private nuisance could be maintained even though the effects were community-

---

[10] Undersigned counsel's understanding is that a subset of the individual Plaintiffs own their homes and/or specific injured trees, including at least Catherine Bordon, John Lyons, John Kyper, Roy Smith, Dennis Sullivan, and Carl Williams. Plaintiffs can provide further detail on this matter to the Court as necessary. The organizational Plaintiffs also suffer economic harm, discussed in Section C, below.

[11] It is irrelevant that Plaintiffs only pleaded the claim as a public nuisance. In Massachusetts, at the notice pleading stage, it does not matter that Plaintiffs labelled their claim a "public nuisance" so long as the facts alleged state a claim for private nuisance. *Baranofsky* at *2. The Plaintiffs in the present case may, therefore, proceed under a private nuisance theory as well.

wide. *Id*. at \*101–102.

The basis for the court's decision rested on the right invaded by the nuisance. Public nuisances invade or impair true public and common rights, such as "the use of a highway, or canal, or public landing place[.]" *Id.* at \*101. These rights are appropriately vindicated by public authorities. There are other nuisance cases, however, where the wrong involves the invasion of a private right, for example injury to personal health or damage to privately owned property. *E.g.*, *Stevens v. Rockport Granite Co.*, 216 Mass. 486, 487 (1914). Although many people may suffer exactly the same private injury from such a nuisance, that does not mean it must be treated as a public nuisance so as to prohibit maintenance of a nuisance claim due to the absence of a unique and special injury. People are not precluded from bringing an action to vindicate their private right just because many other people suffer the same invasion. *Wesson*, 95 Mass. at \*102–103. This same reasoning was adopted and applied as recently as 2020. *See Baranofsky v. Rousselot Peabody, Inc*., No. 2084CV00896-BLS2, 2020 WL 4049942. Here, the property-owning Plaintiffs are suffering individual, specialized harms in the form of diminution of property value, and they are entitled to proceed under at least a private-nuisance theory.

> **B.      The Report and Recommendation's Reliance on the Specificity of Physical Intrusion Harms in the *Ryan* Case Compared to the Economic Harms in the Present Case is Misplaced.**

The R&R recommends that Count 12 should be dismissed because the economic injury suffered by the Plaintiffs in the present case are not as "specific" as the physical intrusion injuries in the *Ryan* case. R&R at 42. But the R&R errs in making its comparison between the instant Plaintiffs' injuries and the Ryan plaintiffs' specific injuries. The special injury analysis demands a different comparison: whether the harm suffered by the plaintiffs at issue is different

in kind compared to the type of harm suffered by the general public.[12] *Sullivan v. Chief Just. For Admin. & Mgmt of Trial Ct.*, 448 Mass. 15, 34–36 (2006). And Plaintiffs satisfy that rule here. Plaintiffs are nearby residents whose property is devalued by gas leaks and shade loss. That is a special injury compared to members of the general public who lose the recreational and health benefits provided by shade trees as they drive or bicycle through or occasionally visit the neighborhood.

In any event, the R&R's distinction between the physical intrusion injuries suffered by plaintiffs in *Ryan* and the economic injuries suffered by plaintiffs in the present case is not a distinction that disqualifies the plaintiffs in the present case from maintaining an action for public nuisance. Economic loss without physical intrusion constitutes a special injury of a direct and substantial character as well. *See Nalley*, 165 Misc.2d at 812–13, 630 N.Y.S.2d 452 (Sup. Ct. 1995) (all the plaintiffs who live in the vicinity of the nuisance source may maintain a public nuisance action based on depreciation in value of their properties, even though they could produce no competent evidence of physical intrusion of contaminants on their properties); *Baranofsky*, 2020 WL 4049942; *Wright*, 224 Mass.; *cf. Stevens v. Rockport Granite Co.*, 216 Mass. 486, 487 (1914) (noise from machines was a nuisance to abutting homeowners where it "interfere[d] with the reasonable comfort and enjoyment of life in the respective houses of the plaintiffs….") (cleaned up).

---

[12] There is one type of injury that almost always qualifies as a special injury: the risk of severe harm, particularly from explosives, can constitute a special injury regardless of its commonality. For example, in *Wright v. Lyons*, the court held that substantial physical risks from storing inflammable and explosive material were sufficient allegations of special damage in a public nuisance action at the pleading stage. 224 Mass. 167 (1916); *see also Commonwealth v. Kidder*, 107 Mass. 188, 192 (1871) (improper storage of inflammable substances is a common law nuisance). Such cases support the R&R's correct decision to deny the Defendants' motion to dismiss Count 13 (risk of explosion from gas leaks).

### C.     Harms to the Organizational Plaintiffs Are Also Special Injuries.

The R&R does not explicitly address whether the harms suffered by the organizational plaintiffs constitute a special injury. However, the R&R's reference to "Plaintiffs' stated goal of protecting and planting more trees," R&R at 41, suggests it is addressing whether the harm to the organizational plaintiffs constitutes a "special injury." In doing so, it concludes that "that harm cannot be said to be a special injury to Plaintiffs 'of a direct and substantial character.'" *Id*. The R&R provides no basis for that conclusion, and Plaintiffs respectfully disagree.

It is hard to imagine a more direct and substantial impact on the missions of the organizational plaintiffs than the proliferation of gas leaks in Chelsea and Boston and the damage they cause to shade trees. The existence of gas leaks and their effect on shade trees and the general urban environment constitute the principal harms these two organizations have been created to address. The effect of gas leaks on health, trees and the urban environment is at the core of the organizational plaintiffs' missions.

Indeed, the allegations in the Amended Complaint that form the R&R's basis for finding that GreenRoots and Mothers Out Front have standing establish that Defendants' gas leaks have a "direct and substantial" effect on GreenRoots and Mothers Out Front. As the R&R states:

> GreenRoots undertakes many activities to increase tree canopy coverage and has planted over 2,000 trees in Chelsea. Gas leaks kill the trees that GreenRoots plants and cares for … Mothers Out Front similarly plants trees and increases canopy coverage in Boston. … Mothers Out Front's mission is among other things, to ensure that all children can live and play and learn in a healthy environment. And to effectuate that, … they plant more trees to increase tree canopy. Gas leaks hinder the organization's projects since the leaks "reduce the tree canopy that we work so hard to increase."

R&R at 9–10 (cleaned up). In short, Defendants' gas leaks are undoing the core work of both organizations. This is, by definition, an effect of a "direct and substantial" character that allows these two organizations to maintain an action for public nuisance.

15

## CONCLUSION

For the foregoing reasons, the Court should sustain Plaintiffs' objections and modify the R&R consistent with the requested disposition above.


DATED: April 14, 2026                    Respectfully submitted,

                                         /s/ Margaret M. A. Nivison
                                         Margaret M. A. Nivison, BBO No. 699047
                                         Heather A. Govern, BBO No. 688482
                                         Conservation Law Foundation, Inc.
                                         62 Summer Street
                                         Boston, MA 02110
                                         (617) 850-1712
                                         mnivision@clf.org

                                         Counsel for Plaintiffs Conservation Law
                                         Foundation, Inc.; GreenRoots, Inc.; Mothers
                                         Out Front, Inc.; Catherine Bordon;
                                         Katherine Calandriello; Claire Corcoran;
                                         Judith Foster; Sarah Freeman; Riena Harker;
                                         Robert Kendall; Wenda Kochanowski; John
                                         Kyper; Stephen Lin; John Lyons; Roy
                                         Smith; Dennis Sullivan; Carlton Williams;
                                         and Timothy Williamson

**CERTIFICATE OF SERVICE**

I certify that on April 14, 2026, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Margaret M. A. Nivison
Margaret M. A. Nivison